PAR: 2023R00363

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. RDB-23-316 |
| | * |
| REGINALD A. HOPKINS, | *   (Wire Fraud Conspiracy, 18 U.S.C. |
| | *   § 1349; Wire Fraud, 18 U.S.C. § |
| Defendant. | *   1343; Forfeiture, 18 U.S.C. |
| | *   § 981(a)(1)(C), 21 U.S.C. § 853(p), |
| | *   28 U.S.C. § 2461(c)) |
| | * |

USDC- BALTIMORE
'23 SEP 11 PM 3:05

**INFORMATION**

**COUNT ONE**
**(Wire Fraud Conspiracy)**

**Relevant Individuals, Entities, and Account**

The United States Attorney for the District of Maryland charges that:

At all times material to the Information:

1. Defendant **REGINALD A. HOPKINS** ("**HOPKINS**") was a resident of Fort Washington, Maryland.

2. **HOPKINS** owned and controlled the following Maryland entities: Prestige 24/7 Auto Sales & Services LLC ("Prestige 24/7"), Prestige Assisted Living Inc. ("Prestige Assisted Living"), and Prestige Executive Transportation Service LLC ("Prestige Executive Transportation").

3. Prestige Assisted Living maintained an account at Wells Fargo Bank ("Wells Fargo"), a financial institution insured by the Federal Deposit Insurance Corporation and doing business throughout the United States, with an account number ending in 3626 (the "3626 Account"). **HOPKINS** was the sole signatory on this account.

4. Prestige 24/7 maintained an account at Wells Fargo with an account number ending in 1415 (the "1415 Account"). **HOPKINS** was the sole signatory on this account.

5. Prestige Executive Transportation maintained an account at Wells Fargo with an account number ending in 5837 (the "5837 Account"). **HOPKINS** was the sole signatory on this account.

6. Cross River Bank was a federally insured financial institution headquartered in Fort Lee, New Jersey.

7. Celtic Bank was a federally insured financial institution headquartered in Salt Lake City, Utah and specialized in small business finance.

8. The United States Small Business Administration ("SBA") approved Cross River Bank and Celtic Bank as lenders in the Paycheck Protection Program ("PPP").

9. Bluevine was a financial technology company headquartered in California that provided online business banking and financing to small and medium-sized businesses. Bluevine served as an originating agent for financial institutions such as Celtic Bank. Bluevine used a server located in West Virginia for the purpose of receiving PPP loan applications.

10. CO-CONSPIRATOR #1 was a resident of Baltimore, Maryland, who ran a purported financial services business.

**The Paycheck Protection Program**

11. The PPP was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

12. To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative

certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses and substantiating that the borrowing business was in operation before or on February 15, 2020, such as filed federal income tax documents.

13. PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located outside of the District of Maryland. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

14. The proceeds of a PPP loan could be used for certain specified business expenses, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

## The Conspiracy and the Scheme to Defraud

15. Beginning in or around June 2020 and continuing through in or around March 2021, in the District of Maryland and elsewhere, the defendant,

**REGINALD A. HOPKINS,**

knowingly and willfully, conspired and agreed with CO-CONSPIRATOR #1, and with others known and unknown to the United States Attorney, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the United States, the SBA, Cross River Bank, Bluevine, and Celtic Bank, and to obtain and attempt to obtain money by means of materially false and fraudulent pretenses,

representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds (the "scheme to defraud"), in violation of 18 U.S.C. § 1343.

### The Object of the Scheme to Defraud

16. It was the object of the conspiracy and scheme to defraud for **HOPKINS** to personally enrich himself by: (1) fraudulently obtaining PPP loans in the amount of more than $1,000,000 for his own personal use and benefit, and for the personal benefit and use of his associates; and (2) offering and paying kickbacks in return for the submission of the false and fraudulent PPP loan applications.

### Manner and Means of the Scheme to Defraud

*PPP Loan #1 ($291,090) – Prestige Executive Transportation*

17. It was part of the conspiracy and scheme to defraud that, on or about June 11, 2020, **HOPKINS**, CO-CONSPIRATOR #1, and others submitted and caused the submission of false materials, including a false PPP loan application, to Bluevine and Celtic Bank to obtain a PPP loan for Prestige Executive Transportation.

18. It was further part of the conspiracy and scheme to defraud that **HOPKINS** and others caused a fabricated and false 2019 U.S. Internal Revenue Service ("IRS") Form 944 (Employer's Annual Federal Tax Return) be submitted with the June 11, 2020 PPP loan application for Prestige Executive Transportation.

19. It was further part of the conspiracy and scheme to defraud that the fabricated 2019 IRS Form 944 purportedly showed that Prestige Executive Transportation paid $1,397,237.78 in 2019 wages to employees. In fact, in 2019 and 2020, Prestige Executive Transportation did not pay such wages and filed no tax records for the 2019 and 2020 tax years.

20. It was further part of the conspiracy and scheme to defraud that, on or about June 14, 2020, **HOPKINS**'s false and fraudulent misrepresentations caused Celtic Bank to fund the PPP loan, and distribute approximately $291,090 to the 5837 Account.

21. It was further part of the conspiracy and scheme to defraud that **HOPKINS** paid CO-CONSPIRATOR #1 kickbacks totaling $58,000, reflecting approximately 20 percent of the PPP loan amount received by Prestige Executive Transportation, in exchange for CO-CONSPIRATOR #1's role in submitting the PPP loan application for the business.

*PPP Loan #2 ($294,771) – Prestige 24/7*

22. It was further part of the conspiracy and scheme to defraud that, on or about March 14, 2021, **HOPKINS**, CO-CONSPIRATOR #1, and others submitted and caused the submission of false information in a PPP loan application to Cross River Bank to obtain a PPP loan for Prestige 24/7.

23. It was further part of the conspiracy and scheme to defraud that **HOPKINS**, CO-CONSPIRATOR #1, and others caused a fabricated and false 2019 IRS Form 940 (Employer's Annual Federal Unemployment Tax Return) to be submitted with the March 14, 2021 PPP loan application for Prestige 24/7.

24. It was further part of the conspiracy and scheme to defraud that the fabricated 2019 IRS Form 940 purportedly showed that Prestige 24/7 paid $1,444,902.60 in wages to all employees in 2019. In fact, in 2019 and 2020, Prestige Executive Transportation did not pay such wages and submitted no tax filings for tax years 2019 and 2020.

25. It was further part of the conspiracy and scheme to defraud that, on or about March 23, 2021, **HOPKINS's** fraudulent and false representations and submissions caused Cross River Bank to fund the PPP loan, and distribute approximately of $294,771 to the 1415 Account.

5

26. It was further part of the conspiracy and scheme to defraud that **HOPKINS** paid CO-CONSPIRATOR #1 kickbacks totaling $75,000, reflecting approximately 25 percent of the PPP loan amount received by Prestige 24/7, in exchange for CO-CONSPIRATOR #1's role in submitting the PPP loan application for the business.

*PPP Loan #3 ($421,363) – Prestige Assisted Living*

27. It was further part of the conspiracy and scheme to defraud that, on or about March 23, 2021, **HOPKINS**, CO-CONSPIRATOR #1, and others submitted and caused the submission of false information in a PPP loan application to Cross River Bank to obtain a PPP loan for Prestige Assisted Living.

28. It was further part of the conspiracy and scheme to defraud that **HOPKINS** and others caused a fabricated and false February 2020 bank statement for the 3626 Account. That false and fabricated bank statement listed a beginning account balance of $123,538.50. In fact, the actual beginning account balance for the 3626 Account was $3.50.

29. It was further part of the conspiracy and scheme to defraud that **HOPKINS**, CO-CONSPIRATOR #1 and others caused a fabricated and false 2019 IRS Form 940 to be submitted with the March 23, 2021 PPP loan application for Prestige Assisted Living.

30. It was further part of the conspiracy and scheme to defraud that the fabricated 2019 IRS Form 940 purportedly showed that Prestige Assisted Living paid $2,022,544.12 in 2019 wages. In fact, in 2019 and 2020, Prestige Assisted Living did not pay such wages and made no tax filings for the 2019 and 2020 tax years.

31. It was further part of the conspiracy and scheme to defraud that, on or about March 25, 2021, **HOPKINS's** fraudulent and false representations and submissions caused Cross River Bank to fund the PPP loan, and distribute approximately $421,363 to the 3626 Account.

32. It was further part of the conspiracy and scheme to defraud that **HOPKINS** paid CO-CONSPIRATOR #1 kickback totaling $44,000, reflecting more than 10 percent of the PPP loan amount received by Prestige Assisted Living, in exchange for CO-CONSPIRATOR #1's role in submitting the PPP loan application for the business.

33. It was further part of the conspiracy and scheme to defraud that during the time period of June 2020 to March 2021, **HOPKINS** caused more than $1,000,000 in PPP loans to be funded and distributed, and caused a portion of the PPP loans to be transferred and used for personal and unauthorized expenses.

34. It was further part of the conspiracy and scheme to defraud that **HOPKINS**, CO-CONSPIRATOR #1, and others known and unknown to the United States Attorney, used interstate wires to submit, assist in the submission, and communicate with each other about the submission of PPP loan applications and to engage in financial transactions.

18 U.S.C. § 1349

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further alleges that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offense in Count One of this Information:

### Wire Fraud Forfeiture

2. Upon conviction under the offense in Counts One of this Information, the defendant,

### REGINALD A. HOPKINS

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes, or is derived from proceeds traceable to the scheme to defraud.

### Substitute Assets

3. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Erek L. Barron*
Erek L. Barron
United States Attorney